PER CURIAM.
Eric Lee Simmons appeals an order of the circuit court denying his initial post-conviction motion filed under Florida Rule of Criminal Procedure 3.851 to vacate his conviction of first-degree murder and sentence of death. He also petitions this Court for a writ of habeas corpus. We have jurisdiction. See art. V, § 3(b)(1), (9), Fla. Const. As explained below, we affirm the postconviction court’s denial of relief as to Simmons’ guilt phase claims. We reverse the denial of relief as to the penalty phase and remand for a new penalty phase proceeding because counsel failed to fully investigate and present mitigating evidence regarding Simmons’ childhood and mental health. We deny Simmons’ petition for writ of habeas corpus.
STATEMENT OF FACTS AND PROCEDURAL HISTORY
Eric Simmons was convicted of the stabbing and beating death of Deborah Tres-sler, who was found dead in a wooded area in Sorrento, Florida. He was also convicted of kidnapping and sexual battery. The jury unanimously recommended a sentence of death and the trial court sentenced Simmons to death for the murder and to life in prison for each of the other charges. The facts of this case as set forth in pertinent part in the direct appeal opinion are as follows:
The evidence presented at trial indicated that on December 3, 2001, at approximately 11:30 a.m., John Conley, a Lake County Sheriffs Office (LCSO) deputy, discovered the body of Tressler in a large wooded area commonly used for illegal dumping. The body was located some 270 feet from the main road. Crime scene technician Theodore Cush-ing took pictures of the body, performed a sketch of the area, and found five tire tracks near the body. The crime scene *484 technicians took plaster cast impressions of the three tracks with the most detail for comparison purposes. Mr. Cushing noticed that the tire tracks indicated that a car made a three-point turn close to the body. All-terrain vehicle tracks were present closer to the body, but they appeared older and deteriorated.
The medical examiner, Dr. Sam Guli-no, observed the victim and the surroundings at the scene on December 3, 2001, with the victim lying on her left side with her right arm over her face. Dr. Gulino estimated the time of death was twenty-four to forty-eight hours before the body was discovered.
Dr. Gulino performed an autopsy, which revealed numerous injuries. Tressler suffered some ten lacerations on her head, as well as numerous other lacerations and scrapes on her scalp and face. There was a very large fracture on the right side of her head, and her skull was broken into multiple small pieces that fell apart when the scalp was opened. Dr. Gulino opined that this injury and the injuries to her brain resulted in shock and ultimately Tressler’s death. There was another fracture that extended along the base of the skull, resulting from a high-energy impact; bleeding around the brain; and bruises in the brain tissue where the fractured pieces of skull had cut the brain. There were numerous stab wounds on the neck, a long cut across the front and right portions of the neck, and other bruises and cuts. There was little bleeding from these injuries, indicating that the victim was already dead or in shock at the time of the injuries. The victim also suffered a stab wound in the right lower part of her abdomen that extended into her abdominal cavity and probably occurred after she received the head injury. There were also injuries to her anus with bruising on the right buttock extending into the anus, and the wall of the rectum was lacerated. These injuries were inflicted before death. Dr. Gulino opined that these injuries would be painful and not the result of consensual anal intercourse. The victim suffered numerous defensive wounds on her forearms and hands. There was also a t-shaped laceration on the scalp and an injury at the base of her right index finger that was patterned, as if a specific type of object, like threads on a pipe, had caused it. Dr. Gulino opined that the attack did not occur at the exact spot where Tressler was found because of the lack of blood and disruption to the area, but stated that the position of Tressler’s body was consistent with an attack occurring in that area.
On December 4, 2001, Robert Bed-good, a crime scene technician, collected evidence from Tressler’s body during the autopsy. Dr. Jerry Hogsette testified that, based on the temperature in the area of Tressler’s body and the development of the insect larvae taken from Tressler’s body, Tressler had been killed between midnight on December 1, 2001, and early Sunday morning, December 2, 2001.
Simmons v. State, 934 So.2d 1100, 1105-06 (Fla.2006) (footnotes omitted).
Witness Andrew Montz also testified at trial. Montz was at the Circle K store near the intersection of State Road 44 and County Road 437 in Lake County late on the night of December 1, 2001, when he saw a white four-door car stopped at the traffic light. A woman opened the passenger side door and screamed for help but the driver pulled her back into the car and drove off. Id. at 1106. Montz testified that the car had a flag hanging from a window. Sherri Renfro testified she was at the same Circle K between 11:30 and 11:40 p.m. and saw a white car approach *485 the intersection. She also saw the passenger door open and a woman screaming for help. Renfro yelled at the driver to stop but he did not, and Renfro got in her van and followed the white car but could not keep up. Renfro also noted the flag hanging from the window. Id.
Montz and Renfro identified Simmons’ white car with a flag hanging from the window as the one each had seen at the intersection, and Renfro identified a photograph of Tressler as the woman she had seen screaming for help. Witness Jose Rodriguez knew Tressler from the laundromat where she worked, and testified that he often saw Simmons with Tressler, including on the night of December 1, 2001. Prior to Simmons’ arrest, Rodriguez was shown a photographic lineup and picked out a photograph that resembled Simmons. After officers learned Simmons drove a white car matching the car seen at the Circle K, sheriffs detectives Stewart Perdue and Kenneth Adams, along with fifteen other officers and a helicopter circling overhead, found Simmons at his parents’ home. The detectives spoke briefly to him and then asked him to accompany them to the sheriffs office to talk. Simmons consented and was handcuffed for the trip to the sheriffs office, but the handcuffs were removed when he arrived.
Once at the sheriffs office, Simmons was advised of his Miranda rights,[1] which he waived, and the detectives questioned him for approximately four hours, two of which were recorded on videotape. Simmons maintained throughout the interrogation that he did not murder Tressler. He told the detectives that he was with Tressler that day and, after trying to watch the Florida-Tennessee football game at his apartment in Mount Dora, she asked to be taken to the laundromat or her trailer because Simmons’ television reception was so poor. Simmons told detectives that he dropped Tressler off at the laundromat and then returned to his apartment.
Although Simmons told officers he had sexual relations with Tressler two weeks before her death, his semen was later reported to have been found in her vagina. During Simmons’ interrogation by detectives Perdue and Adams, the detectives learned that blood had been found in Simmons’ car. At that point, which occurred when the interrogation was not videotaped, the detectives informed Simmons that blood was found in his car and he responded, “Well, I guess if you found blood in my car, I must have did it.” Blood found in his car was later determined to belong to Tressler after DNA testing was performed. Casts made from tire tracks found near Tressler’s body were found to match two of the tires on Simmons’ car. The rear tires of his car were different brands and were consistent with two of the three tire casts taken at the scene.
The jury convicted Simmons of first-degree murder, kidnapping, and sexual battery using force likely to cause serious injury. The case proceeded directly to the penalty phase, at which the defense presented two mitigation witnesses — jail officer Sergeant Craig Leslie and Simmons’ sister, Ashley Simmons. By special interrogatory verdict, the jury unanimously found three aggravating factors had been proven and recommended a sentence of death.[2] Subsequent to the penalty phase jury proceeding, the trial court held a *486 Spencer[3] hearing at which the defense presented Dr. Elizabeth McMahon, who testified that Simmons had a moderate to severe learning disability and no significant history of violence. The trial court entered an order imposing the death sentence based on finding and weighing three aggravators against eight nonstatutory mitigators.
On direct appeal, we affirmed. Although we concluded that methods used by law enforcement in obtaining the eyewitness identification made by Montz and Renfro of the vehicle and Tressler were highly suggestive, we concluded the testimony was admissible because, based on the totality of the circumstances, the identification procedure did not give rise to a substantial likelihood of irreparable mis-identification by Montz and Renfro. See Simmons, 934 So.2d at 1118-19. We also found no merit in Simmons’ other claims,[4] including his claim that the trial court erred in denying his motion to suppress his statements made to the detectives. Simmons’ motion contended that the statement was the product of an arrest made without probable cause. See id. at 1113— 14.
Motion for Postconviction Relief
Simmons filed his initial motion for post-conviction relief under Florida Rule of Criminal Procedure 3.851 in 2008, raising six claims, some with multiple subissues. An evidentiary hearing was held in December 2009 and January 2010 on all his post-conviction claims except his claim challenging the constitutionality of lethal injection. Forty-three witnesses testified and numerous exhibits were introduced into evidence, although Simmons did not testify at the evidentiary hearing. On August 23, 2010, the circuit court entered its eighty-seven-page order denying postconviction relief. The details of the postconviction court’s ruling that are pertinent to the issues raised in this appeal will be discussed when we discuss each issue below.
In this appeal, Simmons raises five claims, some with multiple subissues.[5] He *487 has also filed a petition for writ of habeas corpus in this Court, raising two claims. We will discuss each issue in turn.
ANALYSIS
I. Guilt Phase Claims of Ineffective Assistance of Counsel

Standard of Review

To successfully prove a claim of ineffective assistance of counsel, both prongs of the Strickland[6] test must be satisfied as follows:
First, the claimant must identify particular acts or omissions of the lawyer that are shown to be outside the broad range of reasonably competent performance under prevailing professional standards. Second, the clear, substantial deficiency shown must further be demonstrated to have so affected the fairness and reliability of the proceeding that confidence in the outcome is undermined. A court considering a claim of ineffectiveness of counsel need not make a specific ruling on the performance component of the test when it is clear that the prejudice component is not satisfied.
Ferrell v. State, 29 So.3d 959, 969 (Fla.2010) (quoting Maxwell v. Wainwright, 490 So.2d 927, 932 (Fla.1986) (citations omitted)). Because ineffective assistance of counsel claims present mixed questions of fact and law, the Court employs a mixed standard of review, deferring to the circuit court’s factual findings that are supported by competent, substantial evidence, but reviewing the circuit court’s legal conclusions de novo. See Sochor v. State, 883 So.2d 766, 771-72 (Fla.2004).
“Judicial scrutiny of counsel’s performance must be highly deferential” and there is a strong presumption that trial counsel’s performance was nót ineffective. Strickland, 466 U.S. at 689, 104 5.Ct. 2052. “A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel’s challenged conduct, and to evaluate the conduct from counsel’s perspective at the time.” Id. “[Strategic decisions do not constitute ineffective assistance of counsel if alternative courses have been considered and rejected and counsel’s decision was reasonable under the norms of professional conduct.” Occhicone v. State, 768 So.2d 1037, 1048 (Fla.2000). The defendant carries the burden to “overcome the presumption that, under the circumstances, the challenged action ‘might be considered sound trial strategy.’ ” Strickland, 466 U.S. at 689, 104 S.Ct. 2052 (quoting Michel v. Louisiana, 350 U.S. 91, 101, 76 S.Ct. 158, 100 L.Ed. 83 (1955)).
Under the second prong of Stnckland, the defendant must prove that “there is a reasonable probability that, but for counsel’s unprofessional errors, the result of the proceeding would have been different.” Hoskins v. State, 75 So.3d 250, 254 (Fla.2011) (quoting Strickland, 466 U.S. at 694, 104 S.Ct. 2052). A defendant need not show “‘that counsel’s deficient *488 conduct more likely than not altered the outcome’ of his potential proceeding, but rather that he establish ‘a probability sufficient to undermine confidence in [that] outcome.’ ” Porter v. McCollum, 558 U.S. 30, 130 S.Ct. 447, 455-56, 175 L.Ed.2d 398 (2009) (quoting Strickland, 466 U.S. at 693-94, 104 S.Ct. 2052). As mentioned above, “when a defendant fails to make a showing as to one prong, it is not necessary to delve into whether he has made a showing as to the other prong.” Preston v. State, 970 So.2d 789, 803 (Fla.2007) (quoting Stewart v. State, 801 So.2d 59, 65 (Fla.2001)). With these principles in mind, we turn to Simmons’ claims of ineffective assistance of counsel in the guilt phase of his trial.
A. Failure to Move to Suppress the Statement as Involuntary
At his trial, the State introduced evidence of the interrogation of Simmons in which, after being advised of his Miranda rights and waiving them, he ultimately stated, “Well, if you found blood in my car, I must have did it.” This statement was given in the second part of the interrogation in response to a detective truthfully informing Simmons that blood had been found in his car.
Prior to his trial, Simmons’ counsel filed a motion to suppress his statements to detectives on the ground that he did not accompany them voluntarily to the sheriff’s office and was illegally arrested without probable cause. The trial court denied the motion and on direct appeal we found no merit in the claim. See Simmons, 934 So.2d at 1113-14. Counsel did not move to suppress the statement on the ground that it was extracted from him involuntarily through coercion. Now, in his postconviction proceedings, Simmons contends that trial counsel was ineffective in not moving to suppress on the ground that the statement was the involuntary product of coercion. He contends there is a reasonable probability that his statement, “Well, I guess if you found blood in my car, I must have did it,” would have been suppressed if the motion had been made on the basis of coercion, thus changing the outcome of his capital trial. In support of his claim, Simmons contends that due to his communicative and intellectual limitations, coupled with coercive police tactics, his one-line incriminating statement should have been excluded as involuntary.[7]
Those portions of the interrogation cited as most coercive by Simmons are the following, which have been placed in context of their occurrence:
MR. PERDUE [detective]:.... If I can say to the state attorney that Erie cooperated with us before we finished with that apartment over there, we might be able to get you some help.
MR. ADAMS [detective]: (Inaudible) angry sometimes (inaudible) first degree murder (inaudible) electric chair, lethal injection (inaudible).
THE DEFENDANT: I didn’t kill that lady (inaudible). I didn’t kill that damn lady.
[[Image here]]
*489 THE DEFENDANT: I didn’t kill her, man.
MR. PERDUE: What did she do to make you mad then?
THE DEFENDANT: (Inaudible) tried to help, give her a place to take a shower, let her fix something to eat. She didn’t even have a stove, she said.
MR. ADAMS: (Inaudible).
THE DEFENDANT: (Inaudible) didn’t do nothing, all I did was drop her off. I don’t care what witnesses say (inaudible).
Later in the interview, the colloquy that can be described as the harshest portion of the interrogation occurred as follows:
MR. PERDUE: See, things ain’t adding up, bro. I’m going to tell you like it is, okay, things ain’t (inaudible).
THE DEFENDANT: Well, I don’t care [what you say].[8]
MR. PERDUE: I [know you] don’t care what [I say]. I’m tired of messing around with you. You’ve got all this evidence [pointing toward you.]
THE DEFENDANT: (Inaudible).
MR. PERDUE: We’re fixing to dissect your apartment. We’re fixing to dissect your parent’s house. We’re going to dissect your car.
You got your own friend calling here now telling me that at 9 o’clock Saturday night he talked to you on your own damn phone, and she’s with you at your apartment. You’re lying to us. I’m going to send you down the road for first degree murder [I’m going to get you a] lethal injection.
THE DEFENDANT: (Inaudible).
MR. PERDUE: — now is that what you want?
THE DEFENDANT: (Inaudible).
MR. PERDUE: I don’t want to see you die. Enough people have died.
THE DEFENDANT: I ain’t killed that lady, man, I don’t give—
MR. PERDUE: Bull—
THE DEFENDANT: — (Inaudible).
MR. PERDUE: — bull, you know who did it (inaudible).
THE DEFENDANT: If I killed—
MR. PERDUE: (Inaudible) killed at.
THE DEFENDANT: I didn’t—
MR. PERDUE: She was with you at 9 o’clock Saturday night, that was well past half time. I watched the freaking game. You’re lying, it’s showing you’re lying. Witnesses are showing you’re lying, son.
We’re opening a door for you, the only door you’re going to get, come on.
THE DEFENDANT: (Inaudible).
MR. ADAMS: We are your only friends you got, your only friends.
MR. PERDUE: And you’re lying to us.
MR. ADAMS: (Inaudible).
THE DEFENDANT: I ain’t kill that lady.
[[Image here]]
MR. ADAMS: You killed her, Eric, was it accidentally or did you just frea-kin’ panic? I believe that’s probably what happened, but you killed her.
[[Image here]]
MR. ADAMS: (Inaudible). Do you want to die? We don’t want to see you die. You’re a grown man, why don’t you fess up to it (inaudible).
*490 THE DEFENDANT: I didn’t kill that lady (inaudible).
[[Image here]]
MR. PERDUE: That’s what you’re going to be saying when you’re laying there on that table and you got that IV stuck in (inaudible).
[[Image here]]
THE DEFENDANT: (Inaudible) is this. I went out to my dad’s Monday. I seen the helicopter and everything flying. I watched the news.
MR. ADAMS: How come you told (inaudible) you didn’t find out anything about that, you talked (inaudible) a fireman, that’s the first time you knew anything happened to her. I’m losing my patience—
THE DEFENDANT: You better get out of my face like that, man, [because I ain’t did nothing.]
MR. ADAMS: No, what did you say.
THE DEFENDANT: I said I was on my way Monday and I seen helicopters.
At the evidentiary hearing, trial counsel Janice Orr testified that after speaking with Simmons, she did not believe his statement that if there was blood in his car, he “must have did it” was a confession, but that it was a sarcastic, flippant remark. Professor Richard Leo, a sociologist and law professor with training in the psychology of police interrogation and false confessions, testified about the circumstances of Simmons’ interrogation which, in Professor Leo’s opinion, created a danger of a false confession. Professor Leo opined that Simmons’ incriminating statement was a “compliant false confession” given to put an end to the interrogation, although he also testified that he could not conclude whether Simmons’ confession was false. The postconviction court denied relief on this claim, concluding that trial counsel was not ineffective in failing to move to suppress the statement as coerced and that her decision to treat the statement as a sarcastic response to the detectives was not unreasonable. The postconviction court further found that the statement was not made in response to any allegedly coercive techniques.
We do not reach the question of whether trial counsel was deficient for not moving to suppress on the ground that the incriminating statement was the product of a coercive interrogation because we conclude that Simmons has failed to meet his burden under the second prong of Strickland. See Preston, 970 So.2d at 803. Simmons has not demonstrated that, but for trial counsel’s alleged error, the result of the proceeding would in all probability be different; that is, he has not demonstrated a probability sufficient to undermine our confidence in the outcome of the guilt phase.
Even absent Simmons’ statement, our confidence in the guilty verdict is not undermined in light of the remaining evidence supporting Simmons’ guilt:
Mr. Rodriguez testified that Simmons was the last person seen with Tressler in the laundromat on the evening of December 1, 2001. Eyewitnesses then saw Tressler trying to escape Simmons’ car and screaming for help at the intersection of State Road 44 and County Road 437. Three eyewitnesses identified the car they saw on the night of December 1, 2001, as resembling a Chevrolet Corsica or Ford Taurus and possessing characteristics matching Simmons’ car. There was blood spatter in Simmons’ car and a large, degraded blood stain on the passenger seat. Tire track impressions taken from the area near where Tressler’s body was discovered matched the two rear tires of Simmons’ car, which were two different tire models. Simmons’ semen was found in *491 Tressler’s vaginal washings. Dr. Gulino testified that Tressler’s autopsy revealed extensive injuries to her anus not consistent with consensual anal sex. In light of these facts and circumstances, we conclude that there is sufficient evidence to find Simmons guilty of kidnapping, sexual battery, and first-degree murder.
Simmons, 934 So.2d at 1111-12. Simmons has not demonstrated a reasonable probability that absent trial counsel’s errors a different result would occur sufficient to undermine this Court’s confidence in the outcome. Because the prejudice prong of Strickland has not been proven, relief is denied on Simmons’ claim that trial counsel was ineffective for failing to move to suppress his incriminating statement on the grounds that it was coerced. We turn next to Simmons’ other contentions that trial counsel was ineffective in the guilt phase of the trial.
B. Stipulation to Irrelevant Evidence and Failure to Argue Sexual Encounter Was Consensual
Simmons next contends that trial counsel was ineffective in stipulating to the fact that vaginal washings from the victim contained Simmons’ semen. The stipulation, which was read twice to the jury, stated:
Ladies and gentlemen, the parties have agreed and stipulated that an analysis of the vaginal washings from Ms. Tressler produced Mr. Simmons’s semen in her vagina. This evidence is offered for the sole purpose of establishing that Mr. Simmons and Ms. Tressler had a sexual encounter. It is not relevant to the sexual battery charge herein as that charge involves allegations of anal penetration and it is not to be considered by you in any way as to that charge.
Additionally, Simmons contends that the error was compounded by trial counsel’s failure to present the testimony of Simmons’ neighbors that Simmons had a consensual sexual encounter on the day of the victim’s murder. Edwin T. Johnson testified at the evidentiary hearing that he and his wife Deborah were Simmons’ neighbors in an apartment building in Mt. Dora for several months in 2001. Johnson testified that on Saturday, December 1, 2001, he and his wife were on their own patio where they overheard Simmons and a woman having what sounded like consensual sex next door. They did not see the woman and did not observe them having sex. Deborah Johnson testified that she did see Simmons’ female companion at the apartment complex on December 1, 2001, around 4 p.m., and she identified a photograph of that woman, who was said to be Tressler. Mrs. Johnson testified that she does not remember speaking with trial counsel and that she never received a subpoena from anyone, although she and her husband were available to testify.
At the evidentiary hearing, trial counsel Janice Orr explained her decision to stipulate to the semen found in the vaginal washings by noting that after she had unsuccessfully argued to exclude the semen evidence, she believed the stipulation would be less damaging than live testimony on the presence of the semen. The stipulation included the statement that the DNA was not relevant to the charge of sexual battery and, Orr testified, she believed that she had tried to include in the stipulation the fact that the sexual encounter was consensual, but ultimately was not successful.
Regarding her failure to present evidence that the sexual encounter was consensual, trial counsel testified that Simmons told her he did not have sex with Tressler on the day of the murder. Thus, although she was aware that Simmons’ neighbors were prepared to testify that they heard Simmons having consensual sex *492 with someone who was probably Tressler on December 1, 2001, Orr believed Simmons’ version of events and also believed that the neighbors’ testimony would not be helpful because they did not actually see anything.
As noted earlier, there is a strong presumption that trial counsel’s performance was not ineffective. See Strickland, 466 U.S. at 689, 104 S.Ct. 2052. Trial counsel made a strategic decision that the stipulation to semen found in Tressler’s vagina would have less of an adverse impact upon the jury than extensive live testimony concerning the semen. On this point, Simmons has failed to prove that trial counsel’s performance was deficient. Additionally, trial counsel’s decision not to call Simmons’ neighbors to testify was also a strategic decision. Orr testified that she believed their testimony would not be very helpful and was in conflict with what Simmons had told her about his actions on that day. She testified that Simmons told her he was not having sex with Tressler that day, but that they were cleaning the porch. Orr believed the Johnsons were incorrect in their assumptions about what was occurring on the porch and decided not to present their testimony. Accordingly, trial counsel was not deficient for failing to call Simmons’ neighbors at trial.
Even if counsel’s performance was deficient in either of these respects, Simmons has failed to demonstrate that absent counsel’s errors, there is a probability of a different result sufficient to undermine our confidence. If the stipulation had not been presented, the fact of Simmons’ semen in the victim’s vagina would have been admitted by way of expert testimony. Moreover, even if counsel had made clear in the stipulation that the sexual contact was consensual, and had presented the testimony of the Johnsons to establish that fact, evidence of consensual sex hours prior to the murder would not diminish the incriminating effect of the eyewitness testimony, evidence of Tressler’s blood found in Simmons’ vehicle, and evidence that his tires matched casts of those taken where Tres-sler’s body was found. Accordingly, Simmons is not entitled to relief on this claim.
C. Failure to Present Expert Testimony on False Confessions
Simmons next contends that trial counsel was ineffective for failing to present the testimony of an expert in false confessions at trial. Professor Leo testified at the evidentiary hearing that because Simmons had a low I.Q. and communicative difficulties, he was: (1) more vulnerable to pressure and likely to confess; (2) more likely to seek guidance from authority figures to mold his behavior; (3) more likely to be submissive; (4) more likely to avoid conflict; and (5) more likely to not understand the consequences of his actions. Although Professor Leo testified that Simmons’ incriminating statement was a “compliant false confession,” he also testified that he could not conclude whether Simmons’ confession was in fact false. The postconviction court in the instant case denied relief on this claim, concluding that Professor Leo’s opinion that the statement was a “compliant false confession” was not supported by the facts and that there was no nexus shown between any coercive tactics and Simmons’ final statement that he “must have did it.” The postconviction court also noted that had the expert testimony been offered at trial, it would have been excluded.[9]
*493 Simmons now contends that his admission that if blood was found in his car, he “must have did it” would have had less significance to the jury had trial counsel presented this expert testimony on false confessions. However, we conclude that Simmons has failed to demonstrate ineffective assistance of counsel for failing to present an expert in false confessions at trial. Orr testified that she did not view the statement as a confession but as a sarcastic comment made in frustration and intended to terminate the interrogation. Further, Simmons has never testified that his incriminating statement was in fact false. Finally, even if Professor Leo had been presented at trial to testify that the circumstances of the interrogation could lead to a false confession, such would not have significantly diminished the incriminating effect of the other evidence. Simmons has not demonstrated that trial counsel was deficient in failing to present Professor Leo or a similar expert at trial; nor has he demonstrated a reasonable probability that, had trial counsel done so, the verdict would have been different, such a probability being one sufficient to undermine our confidence in the result. Accordingly, relief on this claim is denied.
D. Failure to Present Terry Simmons’ Testimony at Trial
Simmons also argues that trial counsel was ineffective in failing to call Simmons’ father, Terry Simmons, to testify that: (1) Simmons did not run from the officers, thus he did not have consciousness of guilt; (2) Tressler had loose bowels during Thanksgiving which may have been the source of DNA evidence in Simmons’ car; and (3) Tressler’s blood found in the car may have come from scratches obtained from helping Simmons move a bougainvillea bush with “ferocious thorns.” This argument is without merit.
The decision not to call Terry Simmons at trial was a strategic one. “[Strategic decisions do not constitute ineffective assistance of counsel if alternative courses of conduct have been considered and rejected and counsel’s decision was reasonable under the norms of professional conduct.” Occhicone, 768 So.2d at 1048. First, both trial counsel Jeffery Pfister and Janice Orr testified that they did not call Terry Simmons as a witness because they were concerned about his prior felony conviction for manslaughter, which stemmed from a bar fight, and the possibility that the jury might believe that violence was an inherited family trait. Pfister testified that the decision was a judgment call based in part on a stipulation between the defense and the State that Simmons spent all of December 2, 2001, with his father. This December 2 date was significant because part of the defense at trial was to argue that Tressler was killed on December 2, 2001, and not December 1, 2001. Pfister further testified that they believed the stipulation would also prevent admission of evidence of Terry Simmons’ conviction. Accordingly, trial counsel was not deficient because the decision not to call Terry Simmons was reasonable under the circumstances.
Moreover, failure to present Terry Simmons’ testimony was not prejudicial for several reasons. First, Simmons’ fail *494 ure to run when the officers came to his father’s home looking for Simmons does not prove innocence. Second, Cathy Simmons, Simmons’ mother, had already testified that Tressler had loose bowels on Thanksgiving. Third, Terry Simmons testified at the evidentiary hearing that he did not see any scratches on Tressler, but did testify that Simmons asked for a Band-Aid for her. Simmons has not established the second prong of Strickland in that he has not shown that, but for counsels’ failure to present Terry Simmons’ testimony, there is a reasonable probability the outcome of the trial would have been different — that is, a probability sufficient to undermine this Court’s confidence in the outcome of the trial. Thus, relief is denied on this claim.
E. Failure to Call Shirley Harness and Carrie Marie Petty to Testify; Failure to Adequately Question Jerry Linton
In this claim of guilt phase ineffective assistance of counsel, Simmons contends that trial counsel’s failure to call Shirley Harness and Carrie Marie Petty, and failure to adequately question defense witness Jerry Linton at trial, constitutes ineffective assistance of counsel because they could have provided exculpatory information.
Harness would have testified that there was no animosity between Simmons and Tressler, but that two brothers named Rodriguez, who frequented the laundromat where Tressler worked, hated Tressler and had threatened to kill her if she did not stop being a “snitch.” Carrie Marie Petty would have testified that she saw an individual named John Yohman with Tres-sler on four or five occasions and they seemed friendly. Yohman had provided a statement to police that he saw Tressler at the laundromat close to midnight on December 1, 2001, and that there was a white vehicle parked outside, although at the evidentiary hearing, Yohman denied having associated with or spoken to Tressler. Simmons contends that Petty’s testimony coupled with Yohman’s denials concerning her would have created reasonable doubt in the jurors’ minds.
As to Jerry Linton, Simmons’ cousin, trial counsel presented his testimony at trial that he met Tressler at Simmons’ apartment in November about one week before the murder. At the evidentiary hearing, Linton testified that Tressler told him that her abusive ex-boyfriend was lurking around town, had beaten her to the point that she limped, and that she was on the run from him. Accordingly, Simmons contends that had trial counsel elicited this evidence at trial, it would have suggested to the jury that either Yohman or the abusive ex-boyfriend committed the murder, thus creating reasonable doubt concerning Simmons’ guilt.
Trial counsel testified that she and her full-time investigator attempted unsuccessfully to locate witnesses Harness and Petty. At the evidentiary hearing, Harness admitted that she was living “on the run” during the time frame in which the murder took place and that she was moving from place to place. She also testified that she was using drugs and alcohol during that time period. Petty testified that she worked at a restaurant that was within 100 to 200 feet of the laundromat where Tressler worked, but stopped working at the restaurant one to two months after Tressler’s murder. Postconviction counsel did not provide evidence that the witnesses were actually available at the time of trial, and did not provide evidence of what efforts are normally used to locate an unavailable witness. “A defendant cannot establish ineffective assistance of counsel based on counsel’s failure to call a *495 witness who is unavailable.” White v. State, 964 So.2d 1278, 1286 (Fla.2007); see also Evans v. State, 995 So.2d 938, 943 (Fla.2008) (finding that trial counsel was not ineffective for failing to call an unavailable witness at trial where reasonable efforts were made to find the witness). Accordingly, Simmons has failed to demonstrate trial counsel’s performance was deficient as to witnesses Harness and Petty.
Trial counsel did present the testimony of Jerry Linton at trial. He testified that he met Tressler at Simmons’ apartment in November about one week before the murder. Simmons claims that trial counsel should have also questioned Linton about his conversation with Tressler in which she told him that a former ex-boyfriend or ex-husband pushed her off a horse and then either kicked her or punched her. Additionally, Linton could have testified that Tressler told him she left Marion County to get away from the individual. At the evidentiary hearing, Linton testified that he observed Tressler limping when he first met her in October.[10] Linton testified that when he asked her if she had gotten hurt, Tressler told him how she had received the injuries. Linton, however, did not know when the injury occurred or when she left Marion County. Trial counsel Orr testified that she did not recall why she did not ask Linton at trial about the conversation he had with Tres-sler.
The postconviction court denied the claim, concluding that the testimony would not have been admitted at trial because it was hearsay without any exception. We agree that this claim lacks merit because Linton’s hearsay testimony would likely have been found to be inadmissible. Trial counsel cannot be ineffective for failing to pursue meritless questions or arguments. See Owen v. State, 986 So.2d 534, 543 (Fla.2008) (citing Melendez v. State, 612 So.2d 1366, 1369 (Fla.1992)). Even if the evidence had been admitted at trial, Linton would not have been able to testify when the injury or violence occurred or whether Tressler still feared her former ex-boyfriend or ex-husband. Accordingly, Simmons has failed to demonstrate that trial counsel’s performance was deficient or that he was prejudiced by counsel’s deficiency, as required in Strickland.
F. Mismanagement of DNA Expert Dr. James Blake
At trial, in an apparent effort to cast doubt on the State’s DNA testing procedures, Simmons presented by telephone the testimony of Dr. James Blake, an expert in DNA analysis, who testified that he analyzed certain items of evidence for the defense. He also testified that he did not test several swabs sent to him because he observed no visible blood on them and because trial counsel had not requested they be tested. After the FDLE could not obtain a DNA profile from the presumptive blood stain on Simmons’ car seat cushion due to the degraded condition of the sample, the State submitted the seat cushion sample, along with a sample of Tres-sler’s mother’s blood, to a laboratory for mitochondrial DNA (mtDNA) sequencing. Brian Sloan, a forensic DNA analyst with Orchid Cellmark forensic DNA laboratory in Dallas, Texas, who performed the mtDNA sequence, explained that mtDNA is inherited maternally and that the mtDNA sequence is a better technique than the Short Tandem Repeat (STR) *496 technique to use on degraded blood samples. See Simmons, 934 So.2d at 1108. Sloan compared the mtDNA extracted from Simmons’ car seat cushion to the mtDNA of Lee Daubanschmide, Tressler’s mother and found that each of the samples had an anomaly in the same place. He concluded that the two mtDNA sequences were consistent. In his opinion, Tressler’s mother or anyone maternally related to her cannot be excluded as contributing to the blood stain on the seat cushion from Simmons’ car.[11] During cross-examination, Dr. Blake agreed that a mother’s mtDNA is maternally inherited and would have the same mitochondrial DNA sequence as her daughter.
Simmons now claims, as he did before the postconviction court, that trial counsel’s failure to properly prepare Dr. Blake to testify and failure to present his testimony in person rather than by telephone constitutes ineffective assistance of counsel because any benefits from his testimony were diminished. Simmons also argues that Dr. Blake’s testimony that Tressler’s mother was a good source of mitochondrial DNA actually bolstered the State’s case. Further, Simmons contends that when trial counsel asked Dr. Blake about samples he never tested, this could have led the jury to believe that Simmons was hiding information.
At the evidentiary hearing, trial counsel testified that she could not secure Dr. Blake’s presence at the trial because the defense could not afford to cover his expenses, although the costs of trial were paid by the State because Simmons was declared indigent by the trial court. She also testified that she would have preferred to have him testify in person rather than by telephone, although she believed his testimony at trial was helpful overall. The postconviction court denied relief on this claim, concluding that even if there was some confusion over Dr. Blake’s testing of the swabs, such does not reach the level of ineffective assistance of counsel. Dr. Blake’s admission on cross-examination that the victim’s mother was a good source of mtDNA was simply a statement of recognized scientific fact.
We agree with the postconviction court that Dr. Blake’s testimony on cross-examination that Tressler’s mother was a good source of mitochondrial DNA was an acknowledgement of a fact and no amount of preparation could have changed Dr. Blake’s response to that particular question. Simmons does not make clear how having Dr. Blake testify by telephone because of a lack of funding constituted ineffective assistance on the part of trial counsel. Additionally, although trial counsel may have been confused about which samples she sent to Dr. Blake for testing, Simmons has not demonstrated that this simple mistake rises to the level of deficiency required to support a claim of ineffective assistance of counsel. Accordingly, because Simmons has failed to demonstrate that trial counsel’s performance was deficient in regard to Dr. Blake, and further fails to demonstrate how Simmons was prejudiced thereby, relief is denied on this claim.
G. Mismanagement of Blood Stain Expert Stuart James
Simmons further asserts that defense witness Stuart James, a forensic scientist and blood stain pattern analyst, was mismanaged or should not have been called as a witness because he did not support the defense proposition that the absence of a large amount of blood in Simmons’ vehicle indicated that Tressler was not killed in the vehicle. In addition, Simmons claims *497 James’ testimony was harmful because he testified that the blood spatter evidence was speculative and that the absence of blood on a defendant’s person does not mean he is innocent. At the evidentiary hearing, trial counsel Orr testified that she discussed the case with James on numerous occasions. According to her testimony, Orr did not feel it necessary to spend a great deal of time preparing him for trial because they already spent a lot of time reviewing the case and because he was a well-known expert who had testified frequently. Trial counsel testified that when James began testifying, she thought he was confusing this case with another because his testimony was very different from their previous conversations.
For instance, Orr testified that James previously told her that the absence of a large amount of blood definitively indicated that the murder had not taken place in Simmons’ car. At trial, James’ testimony was more tentative. James noted that he preferred to testify about blood stains he could see as opposed to testifying about the absence of blood stains, because the absence of blood could have several potential explanations. Additionally, he testified that he often tells defense attorneys that an absence of blood on the defendant’s clothes does not necessarily mean that the defendant is innocent. Nevertheless, because of the fairly limited blood stains and absence of more supporting evidence, he could not conclude that a beating, stabbing, or gunshot wound had occurred in the car. He also testified that, based on the injuries and the autopsy report, he could not draw the conclusion that the murder occurred inside the vehicle. Nor could he say whether Tressler was transported in the car after the wounds took place. Thus, some of James’ testimony was unanticipated by trial counsel.
Although some of James’ testimony was unanticipated, Simmons failed to establish that this resulted from a lack of preparation. Trial counsel met with or discussed the evidence with James on numerous occasions. Moreover, Simmons has not shown that, absent trial counsel’s alleged errors, there is a reasonable probability that a different outcome would result, thus undermining this Court’s confidence. James’ testimony still allowed trial counsel to argue that Tressler was not killed, wounded, or transported while injured in the car because the “fairly limited” amount of blood stains was not sufficient for him to reach that conclusion. Because ineffective assistance of counsel has not been demonstrated in this claim, relief is denied.
H. Failure to Discover and Present Testimony of John Fitzpatrick’s Involvement in the DNA Testing
In his next claim, Simmons argues that trial counsel was ineffective in failing to investigate, discover, and introduce evidence regarding DNA expert John Fitzpatrick’s involvement in this case.[12] Testimony presented at the evidentiary hearing showed that on January 12, 2002, Fitzpatrick, the Florida Department of Law Enforcement (FDLE) analyst who initially handled the forensic evidence in this case, altered the computer data for a DNA proficiency test he was given beginning on December 4, 2001. Fitzpatrick altered the data on the sample sheet in the computer in an effort to provide correct labeling information for two test samples which he *498 had erroneously switched during one of the steps in his proficiency examination. Fitzpatrick did not advise his supervisors of his testing error or of his attempt to correct it in the computer. After his computer alteration was discovered on January 24, 2002, Fitzpatrick was asked to resign in lieu of being fired. Robyn Rags-dale, FDLE laboratory analyst and statewide technical leader for biology in 2001, testified that FDLE conducted a quality assurance review of Fitzpatrick’s eighteen open cases and his thirty-four recently completed cases and issued a report on February 2, 2002. This quality review disclosed no additional instances of mislabeling of samples or switching of samples during testing. Fitzpatrick did not testify at trial and all the evidence was retested by Shawn Johnson, the FDLE analyst who did testify at trial as to DNA evidence, the rape kit, and other swabs and slides submitted as part of the investigation.
Simmons now contends that trial counsel was ineffective in her investigation and failure to present evidence concerning Fitzpatrick. Simmons argues that the State’s case would have been severely weakened had the jury been informed of Fitzpatrick’s involvement because trial counsel could have argued to the jury that the blood evidence was tainted, could have been contaminated, and was falsified. At the evidentiary hearing, trial counsel testified that she was aware of the problem with Fitzpatrick and agreed that her investigator had prepared a spreadsheet summarizing all of the physical evidence in the case. The spreadsheet noted that there were three pieces of physical evidence handled by Fitzpatrick. The files that trial counsel received from the public defender’s office also contained information regarding Fitzpatrick. Accordingly, Simmons has failed to demonstrate that trial counsel’s performance was deficient as it relates to failure to discover or investigate Fitzpatrick’s involvement in the case. We also disagree that trial counsel was ineffective in failing to present evidence concerning Fitzpatrick at trial in order to speculate to the jury that the DNA evidence was contaminated or falsified. The evidence presented at the evidentiary hearing established that Shawn Johnson retested all the items handled by Fitzpatrick, and Simmons presented no evidence at the eviden-tiary hearing that the forensic evidence in this case was contaminated, tainted, or falsified. Thus, we conclude that trial counsel was not ineffective in failing to present evidence concerning Fitzpatrick’s initial involvement with the DNA analysis.
We also conclude that Simmons has failed to show a reasonable probability that, but for counsel’s failure to present evidence concerning Fitzpatrick, the outcome of the trial would have been different — a reasonable probability being one sufficient to undermine this Court’s confidence in the outcome of the trial— based on Fitzpatrick’s alteration of the proficiency test data, his resignation, or his involvement with the DNA evidence in this case. Evidence presented at the eviden-tiary hearing demonstrated that Fitzpatrick initially handled the forensic evidence in this case and, before he resigned for falsifying information on his proficiency test, he had tested most, but not all, of the DNA evidence. Shawn Johnson testified at the evidentiary hearing that he retested all the items tested by Fitzpatrick, and that the blood stains in Simmons’ car were submitted to FDLE after Fitzpatrick left the agency. Simmons has not demonstrated that Johnson’s test results are inaccurate or incorrect. The argument proffered by Simmons that the jury could believe the DNA evidence tested by Johnson was tainted has no basis in fact and is mere *499 speculation.[13] Accordingly, Simmons cannot demonstrate that, absent trial counsel’s alleged errors in regard to Fitzpatrick, there is a probability of a different result sufficient to undermine this Court’s confidence in the outcome of the trial. For these reasons, relief is denied on this claim.[14]
II. Guilt Phase Brady and Giglio Claims
Simmons raises several claims in this section. First, he contends that the State willfully withheld exculpatory and impeachment evidence concerning John Fitzpatrick in violation of Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). He also contends that the State presented, or failed to correct, false or misleading testimony from Sherri Renfro and Jose Rodriguez in violation of Giglio v. United States, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972).

Standard of Review

Claims under both Brady and Giglio present mixed questions of law and fact. See Sochor, 883 So.2d at 785. This Court defers to the lower court’s findings of fact if they are supported by competent, substantial evidence. See Hurst v. State, 18 So.3d 975, 988 (Fla.2009); see also Taylor v. State, 62 So.3d 1101, 1114 (Fla.2011) (noting that “[questions of whether evidence is exculpatory or impeaching and whether the State suppressed evidence are questions of fact, and the trial court’s determinations of such questions will not be disturbed if they are supported by competent, substantial evidence”). This Court reviews the trial court’s application of the law to the facts de novo. Hurst, 18 So.3d at 988.
To establish a Giglio violation, the defendant must show that: (1) the prosecutor presented or failed to correct false testimony; (2) the prosecutor knew the testimony was false; and (3) the evidence was material. See Tompkins v. State, 994 So.2d 1072, 1091 (Fla.2008). “If there is a reasonable possibility that the false testimony may have affected the judgment of the jury, a new trial is required.” Craig v. State, 685 So.2d 1224, 1226 (Fla.1996). “In order to establish a Brady violation, the defendant must demonstrate that (1) favorable evidence, either exculpatory or impeaching, (2) was willfully or inadvertently suppressed by the *500 State, and (3) because the evidence was material, the defendant was prejudiced.” Mungin v. State, 79 So.3d 726, 734 (Fla.2011). The materiality prong is met where the defendant demonstrates a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different, with a reasonable probability being one that is sufficient to undermine confidence in the outcome. Id. We first discuss the alleged Brady violation concerning John Fitzpatrick.
Simmons contends that the State committed a Brady violation when it failed to provide the defense with evidence of Fitzpatrick’s misconduct on his proficiency examination. Trial counsel Janice Orr testified at the evidentiary hearing that she was aware that Fitzpatrick had been involved as an analyst in the case and further, that she had access to the public defender’s files which included information about Fitzpatrick. The trial court also found based on competent, substantial evidence that the prosecutor had informed Simmons’ public defender that Fitzpatrick was the analyst who initially worked on the DNA samples in Simmons’ case. Orr testified that she did not recall whether Fitzpatrick was fired, but when the case went to trial, she knew there had been a problem with his work. Trial counsel also agreed that her files contained a spreadsheet prepared by her investigator at the time of trial which indicated Fitzpatrick had worked on some of the evidence in the case and that he was fired. Trial counsel testified at the evidentiary hearing that she did not pursue the Fitzpatrick proficiency testing problem and his leaving FDLE because “it became a nonissue.” Shawn Johnson, another FDLE DNA analyst, retested all the evidence after Fitzpatrick resigned and the results were consistent with Fitzpatrick’s.
Simmons is correct that when he was represented by a public defender, the trial court did enter an order compelling disclosure of a number of items relating to the forensic testing, including all proficiency test results of any analyst who performed work in the case. Fitzpatrick’s proficiency testing information and a document prepared by Fitzpatrick appearing to be a report on the testing he did in this case were not specifically provided.[15] Whether or not the State should have disclosed the Fitzpatrick draft report and the material concerning his proficiency testing, it is clear that Simmons’ subsequent trial counsel, Janice Orr, was well aware that there had been a problem with Fitzpatrick, and knew that he had been the initial examiner in the case and, she believed, that he was fired. “Although the ‘due diligence’ requirement is absent from the Supreme Court’s most recent formulation of the Brady test, it continues to follow that a Brady claim cannot stand if a defendant knew of the evidence allegedly withheld or had possession of it, simply because the evidence cannot then be found to have been withheld from the defendant.” Oc-chicone, 768 So.2d at 1042.
Even if the specifics of the proficiency testing problem were not provided to counsel, Simmons cannot establish that the evidence was exculpatory or impeach *501 ment evidence nor can he establish that the evidence was material and thus prejudicial. Fitzpatrick’s conduct on the proficiency test was not exculpatory in the case, nor did his lack of proficiency and lapse in integrity impeach the DNA and other forensic results that were testified to at trial by Johnson, who independently retested the evidence. There was no indication that any of the evidence was tainted by Fitzpatrick during the investigation. Finally, even if the evidence of Fitzpatrick’s misconduct and the FDLE’s handling of that misconduct had been introduced, there is no reasonable probability — measured by whether our confidence in the outcome is impaired or undermined — that the proficiency testing evidence would have resulted in a different verdict in the case. Thus, relief is denied on this Brady claim. We turn next to Simmons’ Giglio claims.
Simmons also contends that the State willfully presented false testimony or failed to correct testimony of Sherri Ren-fro and Jose Rodriguez, which the prosecutor learned was false. During Renfro’s testimony at trial in September 2003, she acknowledged that she was placed on probation in April 2003 for a conviction of dealing in stolen property. She testified at trial, however, that she was not “in trouble with her probation officer” or “at risk of going to jail.” At the evidentiary hearing, Renfro testified that at the time of the trial, she was fearful of violating her probation because she did not have a stable residence or a job, and was pregnant. Renfro was asked at the evidentiary hearing about a May 13, 2003, report of her probation officer, in which the probation officer stated that she informed Renfro she was currently in violation of her probation and directed her to report for transfer papers to change her probation to Lake County. Renfro testified that she did not feel that she was in violation because she had contacted her probation officer to get transfer papers and had been honest with her. On June 10, 2003, the prosecutor, William Gross, called and left a message at the probation office notifying them that Renfro had moved to Lake County. Renfro testified that she did not recall being in violation of probation, but recalled the transfer; and said that she was not using the state attorney’s office to try to avoid the risk of being charged with a violation of probation.
Renfro agreed that on June 3, 2003, she asked for help from the state attorney’s office to get into a women’s shelter because she was pregnant and homeless. A state attorney investigator made an unsuccessful telephone call to attempt to locate a shelter bed for Renfro. On July 22, 2003, Renfro was given a suspended twenty-day jail sentence on the condition that she complete her probation requirements by September 22, 2003. The prosecutor wrote a letter to Judge Boylston dated September 25, 2003, which was six days after Simmons’ trial ended, which advised the court that Renfro had been unable to pay fines and costs by September 22, 2003, because she could not find work due to her pregnancy. The prosecutor testified at the evidentiary hearing that at the time of trial, he did not know that Renfro owed any money or was under any specific obligations imposed by Judge Boylston. He also testified that he never asked a probation officer to give Renfro any kind of special treatment and that he kept apprised of her location and whether she had a place to stay so he would know where to locate her at the time of trial. Renfro also testified at the evidentiary hearing that she violated her probation by possession of drugs several months after Simmons’ trial.
The postconviction court found that the State had not knowingly present *502 ed false testimony at trial. The court further concluded that because Renfro’s testimony at the evidentiary hearing was inconsistent regarding whether at the time of trial she was afraid that she would be charged with violating probation, it would assume for the purpose of the ruling that Renfro lied at trial. Even so, the postconviction court concluded that the false testimony was not material because a second witness corroborated her eyewitness testimony and because she gave her witness statements to police well before any incentive to lie arose. We agree that Simmons failed to establish that the State knowingly presented or failed to correct any false testimony at trial and that, even if Renfro’s testimony on the question was false, prejudice has not been established. Thus, relief on this aspect of Simmons’ Giglio claim is denied.
Simmons also contends that the state presented false testimony of Jose Rodriguez, who testified at trial that he knew Tressler from the laundromat and that he saw Simmons with Tressler on the night of December 1, 2001. Rodriguez was arrested on unrelated charges on December 2, 2001, prior to his December 5 interview by police in which Rodriguez was shown a photographic lineup and picked out a photograph of a person who resembled Simmons. Rodriguez testified at trial that the State had done nothing to reduce his sentence or provide him with any preferential treatment, although he did testify that the police contacted his bondsman to try to help him get out of jail. The police did not give him any money or post bond for him. The postconviction court held that Rodriguez did not lie at trial and that this information had been previously provided to defense counsel. We agree that Simmons has failed to demonstrate that Rodriguez lied at trial about any help received from the prosecutor in his unrelated criminal charge. Relief is therefore denied on this aspect of Simmons’ Giglio claim. We turn next to Simmons’ claim that the cumulative effect of errors committed in the guilt phase requires reversal for a new guilt phase trial.
III. Cumulative Error
Simmons contends that errors demonstrated in the proceedings below cumulatively entitle him to a new guilt phase trial. We explained in Troy v. State, 57 So.3d 828 (Fla.2011), concerning cumulative error:
Where multiple errors are discovered in the jury trial, a review of the cumulative effect of those errors is appropriate because “even though there was competent substantial evidence to support a verdict ... and even though each of the alleged errors, standing alone, could be considered harmless, the cumulative effect of such errors [may be] such as to deny to defendant the fair and impartial trial that is the inalienable right of all litigants in this state and this nation.”
McDuffie v. State, 970 So.2d 312, 328 (Fla.2007) (alterations in original) (quoting Brooks v. State, 918 So.2d 181, 202 (Fla.2005)). However, where the allegations of individual error are procedurally barred or meritless, a claim of cumulative error also fails. See Israel [v. State, 985 So.2d 510, 520 (Fla.2008)] (citing Parker v. State, 904 So.2d 370, 380 (Fla.2005)).
Troy, 57 So.3d at 844. Because Simmons has failed to establish that any guilt phase errors occurred that either individually or cumulatively would entitle him to a new guilt phase trial, we deny relief on this claim. We turn next to Simmons’ penalty phase claims.
*503 IY. Penalty Phase Claims of Ineffective Assistance of Counsel
Penalty phase claims of ineffective assistance of counsel are also reviewed under the two-prong test established by Strickland, and “[i]n reviewing a claim that counsel’s representation was ineffective based on a failure to investigate or present mitigating evidence, the Court requires the defendant to demonstrate that the deficient performance deprived the defendant of a rehable penalty phase proceeding.” Hoskins, 75 So.3d at 254. Both prongs of the Strickland test present mixed questions of law and fact; thus, in reviewing a trial court’s ruling after an evidentiary hearing on an ineffective assistance of counsel claim, we employ a mixed standard of review, deferring to the post-conviction court’s factual findings that are supported by competent, substantial evidence, but reviewing the postconviction court’s application of law to the facts de novo. See Mungin, 932 So.2d at 998.
“It is unquestioned that under the prevailing professional norms ... counsel ha[s] an ‘obligation to conduct a thorough investigation of the defendant’s background.’” Porter, 130 S.Ct. at 452 (quoting Williams v. Taylor, 529 U.S. 362, 396, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000)). Moreover, counsel must not ignore pertinent avenues for investigation of which he or she should have been aware. See Porter, 130 S.Ct. at 453. “[I]t is axiomatic that ‘counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary.’ ” Hurst, 18 So.3d at 1008 (quoting Strickland, 466 U.S. at 691, 104 S.Ct. 2052).
In the context of penalty phase errors of counsel, the prejudice prong of Strickland “is shown where, absent the errors, there is a reasonable probability that the balance of aggravating and mitigating circumstances would have been different or the deficiencies substantially impair confidence in the outcome of the proceedings.” Hoskins, 75 So.3d at 254 (quoting Gaskin v. State, 737 So.2d 509, 516 n. 14 (Fla.1999), receded from in part on other grounds by Nelson v. State, 875 So.2d 579, 582-83 (Fla.2004)).
In this case, Simmons “must show that but for his counsel’s deficiency, there is a reasonable probability he would have received a different sentence. To assess that probability, we consider ‘the totality of the available mitigation evidence — both that adduced at trial, and the evidence adduced in the [evidentiary hearing]’ — and ‘reweig[h] it against the evidence in aggravation.’ ” Porter, 130 S.Ct. at 453-54 (quoting Williams, 529 U.S. at 397-98, 120 S.Ct. 1495). See also Wiggins v. Smith, 539 U.S. 510, 534, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003). However, the Supreme Court reiterated in Porter that “[w]e do not require a defendant to show ‘that counsel’s deficient conduct more likely than not altered the outcome’ of his penalty proceeding, but rather that he establish ‘a probability sufficient to undermine confidence in [that] outcome.’ ” Porter, 130 S.Ct. at 455-56 (quoting Strickland, 466 U.S. at 693-94, 104 S.Ct. 2052).
After applying these principles to the facts of this case, we conclude that penalty phase counsel was deficient in failing to fully investigate and present substantial mental and background mitigation. Further, based on consideration of the totality of available mitigation, when reweighed against the aggravation in this case, our confidence in the outcome of the penalty proceeding is undermined. Thus, Simmons has satisfied the prejudice prong of Strickland. Accordingly, as explained below, we vacate the sentence of death and *504 remand for a new penalty phase proceeding.
Trial counsel Orr testified at the eviden-tiary hearing that she did not consult a mental health expert when she took over representation of Simmons. She believed he was competent and did not investigate any other aspects of mental mitigation. Dr. Elizabeth McMahon was a psychological expert retained by the public defender’s office before Orr took over Simmons’ case. Dr. McMahon’s testimony was not presented during the penalty phase trial, but was presented only at the Spencer hearing where she testified that Simmons was immature, with a moderate to severe learning disability, but no significant history of violence. At the evidentiary hearing, Dr. McMahon testified that she never thought it necessary to order a PET[16] scan of Simmons’ brain, even though she was aware that he experienced a partial suffocation incident as a toddler that required medical intervention. The only witnesses presented to the jury in the penalty phase were Sergeant Craig Leslie, a Lake County correctional officer, and Simmons’ sister, Ashley Simmons. Sgt. Leslie testified about Simmons’ good jail record, but also related that Simmons asked to be housed separately from other inmates after his verdict because, he said, he might hurt someone. Ashley Simmons testified at the penalty phase that Simmons came from a close, Christian family, and was involved in church and other community activities. However, she made critical comments concerning the victim in this case.
At the postconviction evidentiary hearing, postconviction counsel presented the testimony of a number of expert witnesses who examined and tested Simmons. Dr. Henry Dee, a psychologist and expert in neuropsychology, examined Simmons’ school records, his special education records, and a forensic assessment performed by Simmons’ first attorneys at the public defender’s office. Dr. Dee also met with Simmons three times, performed a neurop-sychological evaluation of Simmons for possible mitigation, and conducted testing — the WAIS-III test,[17] the Denman neuropsychology Memory Scale, and two tests to assess cerebral damage and frontal lobe functioning. The WAIS battery of tests showed that Simmons falls in the borderline range with a full-scale IQ of 79. The Denman test showed an IQ of 83. Dr. Dee testified that Simmons’ school records showed problems with language functioning not proportional to his intellectual functioning. Simmons reads at a fourth grade level and his grades showed difficulty with math, although Simmons performed adequately in other subjects. Simmons was impulsive and overactive in school and had behavioral problems. Dr. Dee learned that Simmons was placed in learning disability classes in second or third grade, and was later placed in special education classes. Simmons was placed in an EH (emotional handicap) class before age nine or ten. By nine or ten, Simmons was placed in SED (severely emotionally disturbed) classes. Simmons dropped out of school in the ninth or tenth grade. Dr. Dee opined that being placed in these special classes led to problems with social acceptance and conflicts with other children, and that this affected Simmons’ later employability and limited his ability to adjust to the workplace.
Dr. Dee’s opinion of Simmons’ neuropsy-chological condition led him to recommend a PET scan to determine if Simmons had brain damage. This recommendation was *505 based in part on information from Simmons’ mother and sister that as an infant, Simmons was accidentally suffocated and taken to the hospital where he was finally revived. Relying on his own investigation and the results of a PET scan performed on Simmons by Dr. Frank Wood, Dr. Dee testified that the PET scan confirmed his opinion of neuropsychological impairment that resulted in years of problems in Simmons’ schooling and which also resulted in impulsivity and behavioral problems. Dr. Dee opined that Simmons’ brain damage led to a “sort of pervasive maladjustment.”
Dr. Dee testified that Simmons also had a borderline personality disorder that manifested in fear of rejection and abandonment, running away from home, affective instability, depression, extreme self-criticism, and social isolation. He opined that Simmons had untreated attention deficit hyperactivity disorder (ADHD) as a child, causing students and teachers to react negatively to him, which reinforced Simmons’ extreme fear of rejection. Dr. Dee also learned from Simmons’ school records that he began using marijuana at age nine and by his mid-teens was consuming up to twelve beers a day. Simmons reported continuing to drink at this level as an adult and to use marijuana three to six times a week. Dr. Dee also testified that people with brain damage are more sensitive to alcohol and drugs. Dr. Dee learned that when Simmons was young, his father was sent to prison for four years on a homicide conviction, causing financial and other hardships for the family.
Dr. Dee opined that Simmons met the criteria for the extreme mental or emotional disturbance statutory mitigator because of the extensive effects of brain damage early in childhood, which impaired his ability to learn and function socially, and to control himself and not be impulsive. Dr. Dee also opined that Simmons could appreciate the criminality of his conduct but had an impaired capacity to conform his conduct to the requirements of law, also a statutory mitigator.
The defense also presented the testimony of Dr. Frank Wood, a psychologist, at the evidentiary hearing. Dr. Wood, an expert in neuropsychology, also was experienced in the use of PET scan measurements to evaluate brain function as it relates to behavioral issues. He oversaw a January 18, 2008, PET scan of Simmons’ brain and concluded that the.PET scan showed “unilateral hypometabolism in a key structure in the middle of the brain called the thalamus.” He testified that the left side of Simmons’ thalamus was abnormally low in its metabolism, which confirmed common findings associated with this condition — cognitive impairment including dyslexia and related impairments in the ability to interpret stimuli coming from the outside world. Dr. Wood testified that the abnormality shown on Simmons’ PET scan was sufficient to cause him to conclude that Simmons has real trouble understanding people and social contexts around him. He explained that an underactive thalamus can also result in impulsive behavior and acting out, because that portion of the brain is also involved in stopping hazardous or inappropriate behavior.
In Dr. Wood’s opinion, the PET scan provides sufficient basis to find that Simmons is persistently and substantially impaired and acts under the influence of extreme mental or emotional disturbance. Dr. Wood also opined that the PET scan corroborates a finding, based on the evidence presented by Dr. Dee, that Simmons meets the criteria for the statutory miti-gator of lacking the capacity to appreciate the criminality of his conduct or to conform it to the requirements of law.
*506 Heidi Hanlon-Guerra, a psychotherapist and mitigation specialist, also testified at the evidentiary hearing. Hanlon-Guerra has a master’s degree and is certified in addiction counseling and rehabilitation in areas involving substance abuse, mental health, and physical disability. She conducted a psychosocial evaluation of Simmons with special attention to substance abuse issues and mitigating circumstances. Hanlon-Guerra testified that Simmons had a blunted affect and was rather concrete in his thinking. She noted that school records showed Simmons had short-term memory deficits and was in learning disabled classes and in classes for the severely emotionally disturbed, which was frustrating for him because he was teased and ridiculed. Hanlon-Guerra testified that, in her opinion, Simmons never developed the skills to live in the adult world.
Hanlon-Guerra learned about Simmons’ family background, including the fact that Simmons’ father went to prison when Simmons was age seven and that his father abused alcohol and marijuana — behavior that Simmons later “modeled” as an adult. Simmons’ learning disabilities made it more difficult to process his father’s absence. Simmons’ aunt told Hanlon-Guer-ra that Simmons stayed with her for a time and would not accept payment for chores he did. He was her “little buddy” and did everything for her. He also helped his grandmother weed the flower bed and do other tasks, and helped his great aunt Mildred. He was good with children, changing their diapers and feeding them a bottle, and he taught his cousins to ride horses. He worked hard with his father in a landscaping business.
The State presented the testimony of Dr. Larry Holder, nuclear medicine physician, diagnostic radiologist, and professor of radiology at Shands Hospital, concerning the subject of PET scans. Dr. Holder testified that he reviewed the PET scan of Simmons’ brain and, in his opinion, the gross structure of Simmons’ brain does not appear to be abnormal and that the metabolism in the thalamus was within normal limits. In his opinion, a PET scan cannot be used with any degree of reliability to diagnose behavioral problems, although on cross-examination he noted that he was not a neuropsychologist or a neurologist. He agreed that he has not examined Simmons and has not read any reports of Simmons’ functional ability, and therefore does not know how Simmons’ brain is functioning.
Even though the State presented expert testimony that Simmons’ brain was not abnormal, the effect of Dr. Wood’s testimony as possible mitigation cannot be completely discounted. As the United States Supreme Court noted in a somewhat similar circumstance in Porter, “While the State’s experts identified perceived problems with the tests that Dr. Dee used and the conclusions that he drew from them, it was not reasonable to discount entirely the effect that his testimony might have had on the jury or the sentencing judge.” Porter, 130 S.Ct. at 455. Moreover, “we have consistently recognized that severe mental disturbance is a mitigating factor of the most weighty order, and the failure to present it in the penalty phase may constitute prejudicial ineffectiveness.” Hurst, 18 So.3d at 1014 (quoting Rose v. State, 675 So.2d 567, 573 (Fla.1996)). “[Mjental mitigation that establishes statutory and nonstatutory mitigation can be considered to be a weighty mitigator, and failure to discover and present it, especially where the only other mitigation is insubstantial, can therefore be prejudicial.” Hurst, 18 So.3d at 1014.
We are aware that the jury and trial judge found three aggravates including HAC, which is considered especially *507 weighty. However, the existence of weighty aggravators such as HAC will not necessarily defeat the need to reverse for a new penalty phase where counsel failed to investigate or present mental mitigation. See id. (reversing for a new penalty phase due to counsel’s failure to present mental mitigation even though the aggravating circumstances included HAC and the fact that the murder was committed during the commission of a robbery). Even though Dr. Holder’s testimony was contradictory to the PET scan testimony presented by Simmons’ expert, the significant body of mitigation evidence that was presented at the evidentiary hearing leads us to conclude that counsel was ineffective in fully investigating possible mitigation and in presenting that available mitigation to the jury. Where “available information indicates that the defendant could have significant mental health problems, such an evaluation is ‘fundamental in defending against the death penalty.’ ” Arbelaez v. State, 898 So.2d 25, 34 (Fla.2005) (quoting Bruno v. State, 807 So.2d 55, 74 (Fla.2001) (Anstead, J., concurring in part and dissenting in part)).
The State contends — and the postconviction court concluded — that trial counsel had a reasoned strategy agreed to by Simmons and his family to present to the jury only mitigation showing that Simmons was a good man from a good family, who helped others in his family and the community. The State argues that Simmons expressly wanted to rely on his claimed innocence and did not want to present evidence to the jury that he had a low IQ, mental deficits, or an alcohol or substance abuse problem. In response to similar arguments, we have stated:
It is true that we have held that a penalty phase strategy of “humanizing” or showing only the good characteristics of a defendant is not necessarily deficient where the strategy is “ ‘dictated’ by the defendant’s insistence on his innocence.” Sliney v. State, 944 So.2d 270, 285 (Fla.2006) (citing Rutherford v. State, 727 So.2d 216, 223 (Fla.1998)). However, in both Sliney and Rutherford, the trial attorney had a sound reason for believing the omitted mitigation would have been harmful in some respect to the defendant’s case.
[[Image here]]
In this case, no sound basis appears for Hurst’s defense counsel to have failed to investigate and present mitigation evidence of Hurst’s borderline intelligence, which was at a lower level than in Rose, possible organic brain damage similar to that in Rose, and other mental mitigation. The evidence did not carry with it any harmful factors, such as in Sliney and Rutherford, which could have defeated the effect of the mitigation. No evidence was presented to show that Hurst’s mental mitigation would have opened the door to any damaging testimony.
Hurst, 18 So.3d at 1011-12. The Supreme Court held in Porter that trial counsel was ineffective where the jury “heard almost nothing that would humanize Porter or allow them to accurately gauge his moral culpability.” 130 S.Ct. at 454. Similarly, in this ease, even assuming trial counsel made the decision to humanize Simmons and only present positive mitigation about him personally, Simmons’ jury heard “almost nothing” in this regard. Moreover, the Supreme Court has held that “counsel’s failure to uncover and present voluminous mitigating evidence at sentencing could not be justified as a tactical decision ... because counsel had not ‘fulfilled] their obligation to conduct a thorough investigation of the defendant’s background.’ ” Sears v. Upton, — U.S. -, 130 S.Ct. 3259, 3265, 177 L.Ed.2d 1025 (2010) (citing Wiggins v. Smith, 539 U.S. *508 510, 522, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003) (quoting Williams, 529 U.S. at 396, 120 S.Ct. 1495)).
In Parker v. State, 3 So.3d 974 (Fla.2009), we reversed for a new penalty phase where counsel presented only “bare bones” mitigation at trial and substantial mental mitigation and mitigation concerning Parker’s childhood were discovered and presented at the postconviction evidentiary hearing. See id. at 984. “The ABA Guidelines provide that investigations into mitigating evidence ‘should comprise efforts to discover all reasonably available mitigating evidence and evidence to rebut any aggravating evidence that may be introduced by the prosecutor.’ ” Id. at 984-85 (quoting ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases 11.4.1(C), at 93 (1989)). In the instant case, it can be said that trial counsel presented only the barest bones of mitigation at trial, and the scant mitigation that was presented was not particularly helpful to Simmons.
The State refers this Court to Hannon v. State, 941 So.2d 1109 (Fla.2006), where we held that counsel was not ineffective in following a strategy to present only evidence that the defendant could not have committed the crime and was a good person, and where the strategy was fully supported by Hannon and his family. Id. at 1127. However, we also noted that Han-non’s counsel did present mitigating evidence concerning his education, character, and family background to the jury through Hannon’s testimony in the guilt phase. Id. at 1128. Moreover, we noted in Hannon that trial counsel had no indication that Hannon suffered any brain injury. Id. at 1133.
In the instant case, trial counsel had available material showing that Simmons had low intelligence, was in special education and classes for the emotionally handicapped in school, dropped out of school early, and suffered the loss of oxygen to his brain as a toddler. They also knew that he had substance abuse problems. Counsel did not advise Simmons of the importance of presenting such mitigation to the penalty phase jury or the court, but instead simply focused on the guilt phase and accepted Simmons’ request not to present anything embarrassing or bad about him. The record does not establish that Simmons was told what mitigation he was waiving — or the effect of such a waiver — in following this strategy. To make an informed strategic choice to limit presentation of mitigation, counsel and the defendant must know what mitigation is available and is being waived. “Case law rejects the notion that a ‘strategic’ decision can be reasonable when the attorney has failed to investigate his options and make a reasonable choice between them.” Rose, 675 So.2d at 573 (quoting Horton v. Zant, 941 F.2d 1449, 1462 (11th Cir.1991)). The United States Supreme Court has rejected the suggestion that a decision to focus on one potentially reasonable trial strategy is justified by a “tactical decision” when counsel does not conduct a thorough investigation of the defendant’s background. See Sears, 130 S.Ct. at 3265.
Moreover, nothing was presented below to show that the possible benefits of the significant, available mitigation presented at the evidentiary hearing would have been offset in the penalty phase by the danger of disclosing something harmful. The mitigation would not have opened the door to evidence that Simmons was a sexual sadist as in Sexton, see 997 So.2d at 1084, or that Simmons was extremely dangerous and likely to kill again as in Haliburton, see 691 So.2d at 471. See also Bowles v. State, 979 So.2d 182, 188 (Fla.2008) (strategic decision not to present mitigation that would open the door to evidence that the *509 defendant was antisocial and dangerous, made after full investigation, was reasonable). In the instant case, the only justification given by trial counsel for ignoring what mitigation they knew of and failing to develop any further mitigation was the fact that Simmons and his family only wanted to present evidence that Simmons was a good person, from a good and loving family, and was unlikely to have committed such a crime.
As noted above, at the evidentiary hearing, Simmons presented substantial evidence concerning both his mental condition and his personal and family background that was clearly mitigating. Even without convincing proof of the brain abnormality, Simmons established the existence of substantial mental mitigation that was not presented to the jury or the judge. Trial counsel had access to much of the family background and personal mitigation concerning Simmons, and could have obtained more information upon reasonable inquiry of Simmons’ family members. Even so, counsel did not have any significant conversations with Simmons’ father, mother, or aunt; nor did counsel consider hiring a mitigation specialist to do an investigation. Trial counsel Orr and Pfister received all the records compiled by the assistant public defenders who represented Simmons for almost one year, including school records, medical records, and forensic assessment forms. Therefore, they knew that Simmons was in several types of special education classes and that he had a low IQ. Because trial counsel were aware of the low IQ, special education, Simmons’ limited oral, reading, and writing abilities, and his serious alcohol abuse, it appears that they did not perform an adequate mitigation investigation into possible mental mitigation based on those circumstances before making the strategic choice to present only “favorable” information about Simmons.
The State is correct that there were three strong aggravators, including HAC — aggravators that were specifically found by the jury on an interrogatory verdict in this case — and this was a particularly cruel and gruesome murder. However, this Court has rejected the notion that the existence of HAC will defeat the need for a new penalty phase when substantial mitigation existed that was not presented to the jury. See, e.g., Hurst, 18 So.3d at 1014. This is especially the case where the only other mitigation is insubstantial. See id. In this case, the mitigation presented to the jury was minimal and actually presented Simmons in a bad light. If the intent was to present substantial evidence humanizing Simmons, that result does not appear to have been achieved. Very little was presented to show that Simmons was a good and valuable member of society. The jury did not hear how he worked hard in his father’s business and helped his relatives. Although his sister said some good things about him, she undermined her mitigation testimony by criticizing the victim.
Counsel may be deemed ineffective at the penalty phase where the investigation of mitigating evidence is “woefully inadequate” and credible mitigating evidence existed which could have been found and presented at sentencing. See Hildwin v. Dugger, 654 So.2d 107, 109 (Fla.1995). In Hildwin, we concluded that counsel was ineffective for failing “to unearth a large amount of mitigating evidence which could have been presented at sentencing.” Id. at 109. We noted that there was an abundance of mitigating evidence presented during the evidentiary hearing in Hildwin, including two mental health experts that the trial court found “most persuasive and convincing,” id. at 110 n. 8, and the existence of both statutory mental health miti-gators and several nonstatutory mitigators *510 (childhood abuse and neglect, history of substance abuse, organic brain damage, and ability to perform well in a structured environment such as prison). Hildwin, 654 So.2d at 110.
In this case, there was also a large amount of mitigating evidence that could have been unearthed and presented in the penalty phase. The decision made by trial counsel to limit mitigation without knowing the full extent of available mitigation was not a reasonable strategic decision based on full information. We have stated that “strategic decisions do not constitute ineffective assistance of counsel if alternative courses have been considered and rejected and counsel’s decision was reasonable under the norms of professional conduct.” Derrick v. State, 983 So.2d 443, 461 (Fla.2008) (quoting Occhicone, 768 So.2d at 1048). The record in this case does not show that counsel knew the full extent of the available alternative course for presentation of mitigation and made a reasonable strategic decision under the circumstances. Defense counsel Orr testified at the evi-dentiary hearing that she was focused on the guilt phase and was shocked when the jury found Simmons guilty. Defense counsel Pfister, who was supposed to be responsible for the guilt phase, also failed to impress upon Simmons and his family the importance of presenting all available mitigation. Based on the foregoing, we conclude that both trial counsel were ineffective in their investigation and presentation of mitigation to. the jury in the penalty phase.
As the Supreme Court reiterated in Porter, “Indeed, the Constitution requires that ‘the sentencer in capital cases must be permitted to consider any relevant mitigating factor.’ ” Porter, 130 S.Ct. at 454-55 (quoting Eddings v. Oklahoma, 455 U.S. 104, 112, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982)). The evidence presented in the evidentiary hearing — much of which was not discovered by trial counsel — even when considered in light of trial counsel’s explanation that she was only doing what Simmons requested, is sufficient to undermine this Court’s confidence in the death sentence in this ease. For that reason, we vacate the death sentence and remand for a new penalty phase proceeding. Finally, we consider Simmons’ petition for writ of habeas corpus.
V. Petition for Writ of Habeas Corpus
Simmons argues in his first habe-as claim that he is exempt from execution under the Eighth Amendment to the United States Constitution because he has mental illness and neuropsychological deficits. He contends that this condition places him in the same category as those persons whose executions are barred because they were under the age of eighteen at the time of the crime, see Roper v. Simmons, 543 U.S. 551, 125 S.Ct. 1183, 161 L.Ed.2d 1 (2005), or who are mentally retarded, see Atkins v. Virginia, 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002). He did not raise this claim in his direct appeal nor did he raise it in his postconviction motion. We have rejected similar habeas claims on numerous occasions in the past, and more recently in the case of Barwick v. State, 88 So.3d 85 (Fla.2011). Barwick claimed in his petition for habeas corpus in this Court that he cannot be executed because his mental age is less than eighteen due to brain damage and mental capacity. The Court concluded the claim was both procedurally barred and without merit. Id. at 106. “This Court has held that ‘[h]abeas corpus is not to be used for additional appeals of issues that could have been, should have been, or were raised on appeal or in other postconviction motions.’” Id. (quoting Schoenwetter v. State, 46 So.3d 535, 562 (Fla.2010)). In [Ray Lamar] Johnston v. State, 70 So.3d *511 472 (Fla.2011), we held that Johnston’s habeas claim that his mental disorders constitutionally bar his execution was pro-eedurally barred and without merit. Id. at 484. We stated, “Specifically, this Court has recently considered and rejected the precise arguments that Johnston raises here regarding the evolving standards of decency in death penalty jurisprudence.” Id. (citing [David Eugene] Johnston v. State, 27 So.3d 11, 26-27 (Fla.), cert. denied, — U.S. -, 131 S.Ct. 459, 178 L.Ed.2d 292 (2010)). In David Eugene Johnston’s case, we stated the following:
Even if the claim were not procedurally barred, we would conclude that it is without merit. The same claim Johnston makes has been repeatedly rejected by the Court. In Nixon v. State, 2 So.3d 137 (Fla.2009), the Court held:
Lastly, Nixon asserts that the trial court erroneously denied him a hearing on his claim that mental illness bars his execution. We rejected this argument in Lawrence v. State, 969 So.2d 294 (Fla.2007), and Connor v. State, 979 So.2d 852 (Fla.2007). In Lawrence, we rejected the defendant’s argument that the Equal Protection Clause requires this Court to extend Atkins to the mentally ill. See 969 So.2d at 300 n. 9. In Connor, we noted that “[t]o the extent that Connor is arguing that he cannot be executed because of mental conditions that are not insanity or mental retardation, the issue has been resolved adversely to his position.” Connor, 979 So.2d at 867 (citing Diaz v. State, 945 So.2d 1136, 1151 (Fla.) cert. denied, 549 U.S. 1103, 127 S.Ct. 850, 166 L.Ed.2d 679 (2006) (indicating that neither the United States Supreme Court nor this Court has recognized mental illness as a per se bar to execution)). Accordingly, Nixon is not entitled to relief on this claim.
Id. at 146. In Lawrence v. State, 969 So.2d 294 (Fla.2007), we also rejected the claim Johnston makes here — that defendants with mental illness must be treated similarly to those with mental retardation because both conditions result in reduced culpability. Id. at 300 n. 9. We find no reason to depart from these precedents. For all these reasons, relief is denied on Johnston’s claim that his mental illness is a bar to execution.
Johnston, 27 So.3d at 26-27.[18]
In the instant case, Simmons makes the same contentions that have been repeatedly rejected by this Court as both procedurally barred in habeas and without merit. Simmons has provided nothing that compels us to depart from our precedent on this issue. Thus, relief is denied on this habeas claim.
In his second habeas claim, Simmons contends that his appellate counsel was ineffective for failing to bring certain arguments to this Court on direct appeal. This Court has explained:
Habeas petitions are the proper vehicle to advance claims of ineffective assistance of appellate counsel. See Rutherford v. Moore, 774 So.2d 637, 643 (Fla.2000); Thompson v. State, 759 So.2d *512 650, 660 (Fla.2000). However, claims of ineffective assistance of appellate counsel may not be used to camouflage issues that could and should have been presented on direct appeal or in a proper postconviction motion. See id. When analyzing the merits of the claim, “[t]he criteria for proving ineffective assistance of appellate counsel parallel the Strickland standard for ineffective trial counsel.” Rutherford, 774 So.2d at 643 (quoting Wilson v. Wainwright, 474 So.2d 1162, 1163 (Fla.1985)). Thus, this Court’s ability to grant habeas relief on the basis of appellate counsel’s ineffectiveness is limited to those situations where the petitioner establishes first, that appellate counsel’s performance was deficient and second, that the petitioner was prejudiced because appellate counsel’s deficiency compromised the appellate process to such a degree as to undermine confidence in the correctness of the result. See id.
“If a legal issue “would in all probability have been found to be without merit’ had counsel raised the issue on direct appeal, the failure of appellate counsel to present the meritless issue will not render appellate counsel’s performance ineffective.” Rutherford, 774 So.2d at 643 (quoting Williamson v. Dugger, 651 So.2d 84, 86 (Fla.1994)). This is generally true with regard to issues that would have been found to be procedurally barred had they been presented on direct appeal. See id. Moreover, appellate counsel is not required to present every conceivable claim. See Atkins v. Dugger, 541 So.2d 1165, 1167 (Fla.1989) (“Most successful appellate counsel agree that from a tactical standpoint it is more advantageous to raise only the strongest points on appeal and that the assertion of every conceivable argument often has the effect of diluting the impact of the stronger points.”).
Davis v. State, 928 So.2d 1089, 1126-27 (Fla.2005). Further, in order to grant ha-beas relief on the basis of ineffectiveness of appellate counsel, this Court must determine
whether the alleged omissions are of such magnitude as to constitute a serious error or substantial deficiency falling measurably outside the range of professionally acceptable performance and, second, whether the deficiency in performance compromised the appellate process to such a degree as to undermine confidence in the correctness of the result.
Pope v. Wainwright, 496 So.2d 798, 800 (Fla.1986). “The defendant has the burden of alleging a specific, serious omission or overt act upon which the claim of ineffective assistance of counsel can be based.” Freeman v. State, 761 So.2d 1055, 1069 (Fla.2000). We consider each of the contentions in turn.
Claim of Ineffective Assistance in Arguing Insufficient Evidence
Simmons first claims that appellate counsel was ineffective in the presentation of the argument that the evidence was insufficient because counsel did not cite case law setting forth the standard of review and because counsel presented what is conceded to be a weak issue first. Simmons provides no authority to support his argument that counsel was ineffective in this respect on appeal. Simmons argues that counsel should have at least cited to Bradley v. State, 787 So.2d 732, 738 (Fla.2001), to remind the Court of the correct standard to apply in the analysis— whether, after viewing the evidence in the light most favorable to the State, a rational trier of fact could have found the existence of the elements of a crime beyond a reasonable doubt. Notably, the Court cited *513 and quoted Bradley for the proper standard of review in the direct appeal opinion. See Simmons, 934 So.2d at 1111 (“In determining the sufficiency of the evidence, the question is whether, after viewing the evidence in the light most favorable to the State, a rational trier of fact could have found the existence of the elements of the crime beyond a reasonable doubt.” (quoting Bradley, 787 So.2d at 738)). Thus, Simmons has not demonstrated an omission by appellate counsel that is of “such magnitude as to constitute a serious error or substantial deficiency falling measurably outside the range of professionally acceptable performance.” See Pope, 496 So.2d at 800.
Claim of Ineffective Assistance in Arguing Trial Court Lacked Jurisdiction and Proper Venue
Simmons next contends that appellate counsel ineffectively argued his jurisdiction and venue claims because counsel attempted to incorporate by reference the arguments made in the lower court. Appellate counsel did note in the initial brief filed on direct appeal that “[t]he arguments in those [pretrial] motions are incorporated herein by reference.” Simmons is correct that we stated on appeal that such does not preserve an argument for appellate review. See Simmons, 934 So.2d at 1112 n. 13. However, appellate counsel did make specific legal argument in the initial brief concerning venue and jurisdiction, and we did consider the two questions on their merits in the direct appeal. We then held that the circuit court has original jurisdiction over prosecution of all felonies that occur in whole or in part in the state. Id. at 1112. We also held that venue was proper because “[v]en-ue need not be established beyond a reasonable doubt” and that if the evidence provides a basis for the jury to infer that the offense was committed in the county, evidence of venue is therefore sufficient. Id. It was reasonable for the jury to conclude the crime occurred in Lake County based on evidence that witnesses observed the victim screaming for help in Simmons’ car in Lake County on the night of December 1, 2001. Id. at 1113. Simmons has failed to show that appellate counsel seriously erred in arguing jurisdiction and venue; and, to the extent that counsel could and should have made a more complete argument, such would be unavailing because the claims were without merit.
Claim of Ineffective Assistance in Arguing Illegal Detention and Lack of Probable Cause for Simmons’ Arrest
Simmons next contends that appellate counsel was ineffective in arguing lack of probable cause for Simmons’ arrest because she only spent two pages discussing the encounter between law enforcement and Simmons, and failed to mention any helpful testimony. While it is true that appellate counsel devoted only several pages to this claim on appeal, appellate counsel did argue that the “circumstances of having virtually the entire [Lake County Sheriffs Office] surrounding the Appellant, with the helicopter overhead, would lead any reasonable person to conclude that it was not a good time to dispute the matter” and “[t]o claim this was voluntary is ludicrous.” Appellate counsel also set forth in the fact section of the direct appeal brief the information that two detectives, accompanied by fifteen additional deputies, came to Simmons’ parents’ property where, Detective Perdue testified, Simmons agreed to accompany them to the sheriffs office to talk. Even if Simmons’ counsel did not sufficiently highlight the factual circumstances surrounding the encounter, this Court’s direct appeal opinion discloses that the Court was well aware *514 that Simmons was contending on appeal that a “thundering herd” of officers came to the property, and that he was handcuffed while transported in the back of the cruiser. Simmons, '934 So.2d at 1113-14. We concluded based on the totality of the circumstances — including testimony that Simmons went with the officers voluntarily, made no objection to the handcuffs that were employed based on safety policy, never expressed a desire to terminate the interrogation, was told he was not under arrest, was informed that the detectives would give him a ride home, was allowed to use the bathroom, and had dinner with the two detectives — that he was not involuntarily detained. Id. at 1114. Further, we determined that the trial court did not abuse its discretion when it found that any custodial detention of Simmons was supported by probable cause. Id. We noted that the officers had evidence Simmons was the victim’s boyfriend, he was the last person to have been seen with her, his car matched the description of the car from which the victim was seen attempting to escape, the officers had statements from witnesses that Simmons may have beaten the victim earlier in the week, and he had a prior arrest for abusing a spouse or girlfriend. Id. Thus, it can be seen that when we decided the direct appeal, we were aware of the circumstances Simmons now contends were not highlighted by appellate counsel.
The habeas petition also refers to passages in the trial transcript in which several deputies testified about the encounter at the property, transportation of Simmons to the sheriffs office, and the circumstances once there. Simmons contends that appellate counsel should have highlighted those portions of the transcript in the brief. However, nothing in the passages demonstrates that Simmons’ agreement to accompany officers to the station was involuntary. Simmons cites testimony given by Deputy Jones at the suppression hearing in which Jones agreed that he had given a prior deposition where he had referred to Simmons being in “custody” at the property before being transported to the sheriffs office: Jones explained, “I was speaking of him being secured, I was speaking that he was with detectives. He was not going anywhere. And the question leading up to it that I was asked, I guess, they took him into custody and then he left.”
Simmons now contends that had that testimony been presented in the initial brief on direct appeal, it would have been “dispositive on the issue of custody.” However, Jones’ conclusion appears to be more speculation than fact and is not in accord with other evidence concerning Simmons’ voluntarily accompanying officers to the sheriffs office. In finding that the trial court did not err in denying the motion to suppress, we noted on direct appeal that “uncontroverted testimony” by the officers indicates that Simmons never expressed any reluctance to accompany the detectives to the sheriffs office and that Simmons was not threatened or coerced in any way. Simmons, 934 So.2d at 1113-14. Based on the totality of the evidence, which was recognized by this Court on direct appeal, Simmons has not provided any basis to conclude that had appellate counsel made more detailed argument and cited the passages of transcript, this Court would have concluded the trial court erred. Any deficiency has not been shown to have compromised the appellate process so as to undermine confidence in the result.
Simmons further contends that if appellate counsel had cited Popple v. State, 626 So.2d 185 (Fla.1993), the Court on direct appeal would likely have agreed that error occurred in denial of the motion to suppress. Popple dealt with whether an officer had probable cause to arrest Popple *515 for cocaine after he was asked to exit his legally parked ear and, in the process of doing so, disclosed a cocaine pipe. Id. at 186. Even if Popple had been cited in the direct appeal, it would not have affected our conclusion that the trial court did not abuse its discretion in finding that any custodial detention of Simmons was supported by probable cause. See Simmons, 934 So.2d at 1114.
Following up on this issue, Simmons finally contends that if appellate counsel had presented detailed testimony of Deputy Perdue on the issue of whether the officers had probable cause to arrest Simmons when they first encountered him at the property, the Court would have found that Simmons was arrested without probable cause. Perdue testified at the suppression hearing that when he went to the property to talk with Simmons, he thought he probably did not have probable cause to arrest. Regardless of what this one officer believed, this Court made its decision based on the totality of the circumstances and evidence, not the subjective belief of one detective. Even if appellate counsel was deficient in not highlighting Deputy Perdue’s belief concerning probable cause, his testimony does not establish prejudice — that is, it does not undermine confidence in the result of the appellate process.
As noted earlier, habeas relief based on appellate counsel’s ineffectiveness “is limited to those situations where the petitioner establishes first, that appellate counsel’s performance was deficient and second, that the petitioner was prejudiced because appellate counsel’s deficiency compromised the appellate process to such a degree as to undermine confidence in the correctness of the result.” Davis, 928 So.2d at 1126. Because this argument “ ‘would in all probability have been found to be without merit’ ” even if counsel more thoroughly presented the facts on direct appeal, “the failure of appellate counsel to present the meritless issue will not render appellate counsel’s performance ineffective.” Id. (quoting Rutherford, 774 So.2d at 643 (quoting Williamson v. Dugger, 651 So.2d 84, 86 (Fla.1994))). For these reasons, habeas relief is denied on this aspect of Simmons’ claim.
CONCLUSION
Accordingly, we affirm in part and reverse in part the trial court’s order denying postconviction relief. We vacate the sentence of death and remand for a new penalty phase proceeding before a jury. We also deny relief on all claims Simmons raised in his petition for writ of habeas corpus.
It is so ordered.
PARIENTE, LEWIS, QUINCE, LABARGA, and PERRY, JJ., concur.
POLSTON, C.J., concurs in part and dissents in part with an opinion, in which CANADY, J., concurs.

. Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

. The aggravators found unanimously by the jury were (1) prior violent felony conviction; (2) the capital crime was committed while the defendant was engaged in the commission of, or attempt to commit, sexual battery, kidnapping, or both; and (3) the capital crime was committed in an especially heinous, atrocious, or cruel manner (HAC).

. Spencer v. State, 615 So.2d 688 (Fla.1993).

. We found no merit in the following claims: The evidence was insufficient to prove kidnapping, sexual battery, and first-degree murder; the trial court erred in determining it had jurisdiction and venue; the trial court erred in denying the motion to suppress statements made pursuant to an unlawful arrest; the evidence taken from Simmons' car should have been suppressed as the product of a search made pursuant to an invalid search warrant; the trial court erred in allowing the State's expert on mtDNA to testify; the prosecutor made improper remarks regarding the mtDNA evidence; the trial court erred in excluding Simmons' expert on eyewitness identification; the entomologist who testified concerning the approximate time of death based on the fly larvae found on Tressler’s body was not qualified as a forensic entomologist; prosecutorial misconduct; the death penalty statute is unconstitutional under Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002); and the evidence introduced to prove the aggravating factors was insufficient. See Simmons, 934 So.2d at 1110-11. We also concluded that the death sentence in this case is proportionate. Id. at 1122-23.

.Simmons claims in this appeal that (1) trial counsel was ineffective in failing to move to suppress his statements to police on the ground that they were coerced; (2) counsel was ineffective in failing to present evidence that Simmons and the victim engaged in consensual sexual relations shortly before the victim went missing, in failing to present an expert in false confessions, in failing to investigate and present evidence concerning DNA expert John Fitzpatrick’s collection and testing of DNA, in failing to call Simmons' father Terry Simmons to testify, in failing to prepare DNA defense expert Dr. Edward Blake and secure his appearance, in mismanaging blood stain pattern expert Stewart James, and in failing to investigate and call witnesses with exculpatory information and failing to question witnesses to rebut the State’s theory of *487 the murder; (3) the State failed to disclose exculpatory and impeaching evidence concerning John Fitzpatrick pursuant to Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and presented and failed to correct false and misleading testimony in violation of Giglio v. United States, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972), and the circuit court erred in denying a motion for default judgment against the State for failing to turn over records relating to John Fitzpatrick; (4) counsel was ineffective in the penalty phase of trial in failing to investigate and present mental health evidence and other mitigation; and (5) cumulative error.

. Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

. In this case, Simmons claims the combination of the following led to the involuntary confession: (1) Simmons has a low I.Q., low intellectual functioning, and communicative difficulties: (2) the interrogation took place over an approximately four-hour period; (3) Sergeant Adams attempted to shock Simmons by pounding on the table and lunging towards him; (4) Detective Perdue threatened that Simmons would receive lethal injection or the electric chair; (5) the detectives told Simmons they would thoroughly search his father's house; (6) the detectives told Simmons they would report his cooperation to the prosecutor; and (7) the detectives suggested Simmons would not get a fair trial.

. As the trial transcript reflects, much of the interrogation is inaudible. When excerpts of the tape were played at the evidentiary hearing, some of the previously inaudible portions were able to be transcribed and are set forth here in brackets.

. In Derrick v. State, 983 So.2d 443 (Fla.2008), we questioned the admissibility of this type of expert testimony, id. at 451 n. 7, although we note that in Ross v. State, 45 *493 So.3d 403, 411 (Fla.2010), cert. denied, - U.S. -, 131 S.Ct. 925, 178 L.Ed.2d 803 (2011), the trial court admitted the testimony of an expert witness concerning circumstances that can lead to false confessions. We have held that "a trial court has broad discretion in determining the range of subjects on which an expert can testify.” Frances v. State, 970 So.2d 806, 814 (Fla.2007). Generally speaking, admission of expert testimony is a matter within the trial court's sound discretion. See, e.g., McMullen v. State, 714 So.2d 368, 369 (Fla.1998) (holding that admission of expert testimony concerning eyewitness identifications is within discretion of the trial judge).

. At trial, Linton testified that he met Tres-sler on a Saturday night in November at Simmons’ apartment. He stated that this was approximately a week before Tressler's murder.

. Tressler’s mother testified that she had never been in Simmons' car.

. Simmons also raises a claim under Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), contending that the State failed to provide the defense with evidence concerning John Fitzpatrick’s involvement with the DNA evidence in this case. That issue is discussed below in subsection II.

. At the evidentiary hearing, Candy Zuleger, a DNA expert, testified on behalf of Simmons. She explained the various issues regarding procedural aspects of the DNA analysis in this case. Although she had some concerns with the procedure followed in relabeling the forensic samples by Johnson, she did not testify that any evidence in this case was tampered with. Additionally, the State relied on Shawn Johnson’s findings in regard to the vaginal washings and his findings were actually statistically more favorable to Simmons.

. Simmons also argues briefly that the post-conviction court wrongfully denied his motion for entry of default judgment against the State for failing to provide Fitzpatrick’s records, which was filed after the evidentiary hearing. Simmons has not preserved this issue for review. "The purpose of an appellate brief is to present arguments in support of the points on appeal ... [and] to merely refer to arguments presented during the postconviction proceedings without further elucidation is not sufficient to preserve issues.” Sexton v. State, 997 So.2d 1073, 1086 n. 14 (Fla.2008) (quoting Doorbal v. State, 983 So.2d 464, 482 (Fla.2008)). Simmons does not refer to the relief requested or the proper authority for the relief, and does not discuss the factual basis for the motion. Additionally, Simmons does not provide a record citation to the lower court’s oral or written order denying the motion, thus failing to inform this Court as to the basis of the lower court’s denial. Thus, Simmons’ argument is simply a reference to an argument presented during postconviction proceedings and has not preserved the issue for this appeal.

. Harry Hopkins, FDLE crime laboratory analyst supervisor for the Orlando Regional Operations Center, testified that the document was never technically and administratively reviewed and thus was never finalized as a "report.” Hopkins testified that he stamped it as a "draft” when Fitzpatrick gave it to him in late January 2002. William Gross, the trial prosecutor, testified that at the time of discovery in the case, he was advised by FDLE that the report was never completed and was not available for release. Fitzpatrick was never listed as a witness and the results of his laboratory work were not used at trial.

. Positron Emission Tomography.

. Wechsler Adult Intelligence Scale — Third Edition.

. We also stated in Johnston:
We distinguish the claim Johnston makes here from a claim of insanity as a bar to execution. In order for insanity to bar execution, the defendant must lack the capacity to understand the nature of the death penalty and why it was imposed. See § 922.07(3), Fla. Stat. (2009); Provenzano v. State, 760 So.2d 137, 140 (Fla.2000). Florida Rule of Criminal Procedure 3.811 provides the procedure for asserting that a prisoner is insane, as that term is defined, and provides that the claim may not be made until a death warrant is signed.
Johnston, 27 So.3d at 26 n. 8.